VICTOR MARRERO, United States District Judge.
Plaintiff Robert M. Cestari ("Plaintiff" or "Cestari") filed this action against defendant The Bancorp, Inc. ("Defendant" or "Bancorp"), alleging violations of New York labor law and breach of contract. ("Original Complaint," Dkt. No. 1.) On July 16, 2018, Bancorp sought the Court's permission to file a motion for summary judgment, both on Plaintiff's claims and on Defendant's counterclaims. Bancorp also requested a pre-motion conference to discuss its contemplated motion. ("July 16 Letter," Dkt. No. 33.) By letter dated July 17, 2018, Cestari opposed Defendant's requests. ("July 17 Letter," Dkt. No. 34.) On July 30, 2018, the Court held a telephone conference during which it directed both parties to submit Rule 56.1 statements of material facts. (See Dkt. Minute Entry for 7/30/2018.) Bancorp filed its Rule 56.1 statement on September 7, 2018 ("Defendant's Rule 56.1 Statement," Dkt. No. 39), and Cestari filed his response to Defendant's Rule 56.1 Statement ("Plaintiff's Counter-statement," Dkt. No. 42), as well as his own Rule 56.1 statement ("Plaintiff's Rule 56.1 Statement," Dkt. No. 43), on September 28, 2018. By letter dated October 1, 2018, Bancorp reiterated its request to file a motion for summary judgment. ("October 1 Letter," Dkt. No. 45.)
For the reasons set forth below, Bancorp's request for a pre-motion conference regarding its contemplated motion for summary judgment is DENIED.
I. BACKGROUND [1]
In September 2015, Bancorp hired Cestari as a Senior Vice President and Head of the Commercial Mortgage Backed Securitization Floating Rate Program. On March 8, 2017, Bancorp terminated Cestari's employment. The principal dispute in this action revolves around the reason for Cestari's termination. According to Cestari, Bancorp terminated his employment on pretextual grounds because the company did not want to pay him the commissions and vested bonus amounts that he alleges he earned. Meanwhile, Bancorp contends that it terminated Cestari's employment because he violated company policy by using his corporate credit card for personal expenses without reimbursing the company.
*330 In his Original Complaint, Cestari asserts that Bancorp unlawfully terminated his employment. Cestari alleges that Bancorp thereafter failed to pay him a promised and earned bonus. According to Cestari, during a conversation in December 2016, Daniel Cohen ("Cohen"), the Chairman of Bancorp and the person to whom Cestari reported, promised Cestari an $ 800,000 bonus for 2016. Cestari alleges that, in February 2017, Bancorp paid him a $ 200,000 bonus in cash and issued him a stock grant valued at approximately $ 200,000 -- for a total bonus of $ 400,000, or only half of what he was owed.
Cestari also alleges that Bancorp failed to pay him promised and earned commissions for two specific transactions that he completed outside the scope of his normal job duties, namely, the "Wells Fargo Securitization" and the "Fixed Rate Portfolio Sale." (See Original Complaint ¶ 11.) According to Cestari, in August 2016, he and Cohen reached an agreement that Cestari would receive a commission of forty percent of the excess profit received by Bancorp as a result of the Wells Fargo Securitization above the two points the company expected from the sale of the loans. Cestari alleges that he subsequently completed the transaction, which netted Bancorp approximately $ 2.4 million in profit, thereby entitling him to a commission of approximately $ 600,000. Cestari alleges that Bancorp never paid him the promised and earned commission for the Wells Fargo Securitization. In a separate but similar claim, Cestari alleges that he and Cohen reached an agreement that Cestari would be paid half a point as a broker's fee on the Fixed Rate Portfolio Sale. Cestari contends that he completed the Fixed Rate Portfolio Sale, which netted Bancorp millions of dollars in profit, thereby entitling him to a commission of approximately $ 500,000. Cestari alleges that Bancorp -- as it did with the Wells Fargo Securitization -- never paid him the promised and earned commission for the Fixed Rate Portfolio Sale.
According to Cestari, Bancorp's stated reason for terminating his employment -- i.e., his use of a corporate credit card for personal expenses -- was pretextual because Cestari was never informed that such use of the credit card might result in the termination of his employment. Instead, Cestari hypothesizes that Bancorp terminated his employment to avoid paying him the promised and earned bonuses and commissions described above.
On June 8, 2017, Cestari filed an amended complaint in which he added causes of action for defamation per se and tortious interference with business relations. ("Amended Complaint," Dkt. No. 5, ¶¶ 55-62, 63-70.) Specifically, he alleges that, since his termination, Bancorp and its employee, Ron Wechsler ("Wechsler"), defamed him and tortiously interfered with his business relations by contacting the company with which Cestari was interviewing for a position, Oaktree Capital Management ("Oaktree"), to spread false information about his termination. Cestari further alleges that Bancorp employees have contacted other individuals for the sole purpose of harming him and preventing him from obtaining a new job. The Amended Complaint thus asserts five causes of action: (1) failure to pay wages - commissions; (2) breach of contract; (3) failure to pay wages - vested bonus amounts; (4) defamation per se; and (5) tortious interference with business relations.
On July 17, 2017, Bancorp answered the Amended Complaint, essentially denying all of Cestari's substantive allegations. ("Answer," Dkt. No. 14.) In addition to answering the Amended Complaint, Bancorp *331 asserts twelve affirmative defenses.[2] Bancorp also asserts five counterclaims against Plaintiff, all of which arise from Cestari's use of a corporate credit card for personal expenses (hereafter, the "Counterclaims"). Specifically, Bancorp asserts the following Counterclaims: (1) fraud; (2) equitable forfeiture and the faithless servant doctrine; (3) conversion; (4) unjust enrichment; and (5) breach of fiduciary duty.
According to Bancorp, the company issued Cestari a corporate credit card, which company policy indicated was to be used only for business-related expenses. Cestari allegedly signed an employee handbook and a code of ethics, both of which prohibited the use of the corporate credit card for personal purchases. Bancorp alleges that, beginning in January 2016, Cestari knowingly used his corporate credit card to charge thousands of dollars in personal expenses in violation of the company's policies. Bancorp further alleges that Cestari falsely represented to Bancorp that the credit card charges were for business purposes and never reimbursed Bancorp for those charges. Furthermore, according to Bancorp, the company released a revised travel and expense policy in February 2017, which gave employees ten business days to submit any outstanding expenses incurred prior to the issuance of the new policy. In connection with that policy, Bancorp notified Cestari that the company had discovered several non-business charges on his corporate credit card and gave him ten days to submit expense reports and/or reimburse the company for the outstanding charges. According to Bancorp, Cestari admitted that he had personal charges on his corporate card, but he failed to submit expense reports or payment for those charges. Bancorp alleges that it subsequently terminated Cestari for cause because he had violated the company's policies by knowingly charging personal expenses to his corporate credit card -- i.e., grounds for termination of employment for cause.
On August 7, 2017, Cestari filed an answer to Bancorp's Counterclaims in which he largely denied Bancorp's substantive allegations. ("Answer to the Counterclaims," Dkt. No. 15.) While Cestari admits that he used his corporate credit card for personal expenses, he asserts that he intended to provide reimbursement to Bancorp. Cestari further contends that, historically, the accounting department notified him of non-business expenses, at which time Cestari reimbursed Bancorp for the personal charges. In the Answer to the Counterclaims, Cestari also asserts eight affirmative defenses.[3]
*332 On October 27, 2017, the Court held an initial conference in this action. (See Dkt. Minute Entry for 10/27/2017.) The case then proceeded to discovery under Magistrate Judge Debra Freeman's supervision (see Dkt. No. 21), and the parties participated in two settlement conferences (see Dkt. Minute Entries for 2/23/2018, 3/5/2018).
On July 16, 2018, Bancorp wrote to the Court, seeking both permission to file a motion for summary judgment and a pre-motion conference regarding its contemplated motion. (See July 16 Letter.) Bancorp anticipates that its motion for summary judgment would seek judgment on each count of Cestari's Amended Complaint. Regarding the first three counts of the Amended Complaint (failure to pay wages - commissions; breach of contract; and failure to pay wages - vested bonus amounts), Bancorp argues that discovery has not uncovered any evidence to substantiate Cestari's claims. According to Bancorp, "there is no genuine issue of material fact that any enforceable oral contract exists." (Id. at 2-3.) Regarding Cestari's fourth cause of action (defamation per se), Bancorp argues that the allegedly false statement (i.e., Cestari was terminated for cause) was, in fact, a true statement and therefore not actionable. Finally, regarding Cestari's fifth cause of action (tortious interference with business relations), Bancorp argues that Cestari cannot prove that Bancorp engaged in the use of wrongful or unlawful means or acted for the sole purpose of harming Cestari. Bancorp also seeks summary judgment on each of its Counterclaims because, according to Bancorp, "[t]he record makes clear that there is no dispute that [Cestari] violated The Bancorp's expense policy, and that he knew he was violating the expense policy." (Id. at 3.)
On July 17, 2018, Cestari responded to the July 16 Letter and opposed Bancorp's request for permission to file a motion for summary judgment. (See July 17 Letter.) Cestari argues that summary judgment on the first three counts of the Amended Complaint as well as Bancorp's Counterclaims would be inappropriate because "[t]his matter involves an oral contract," which is "a classic 'he said; she said' the resolution of which must be left to a trier of fact." (Id. at 1.) Cestari further argues that the fourth and fifth causes of action (defamation per se and tortious interference with business relations) similarly involve issues of fact and state of mind -- namely, whether Bancorp employees made false statements about Cestari with the intent required for the alleged violations of law.
After receiving the parties' letter exchange, the Court scheduled a telephone conference, which was held on July 30, 2018. During that call, the Court directed Defendant to submit a statement of facts (a "Rule 56.1 Statement") by September 7, 2018, and Plaintiff to submit a response by September 21, 2018. (See Dkt. Minute Entry for 7/30/2018.)
*333 Pursuant to the Court's directive, Defendant filed its Rule 56.1 Statement, along with a letter to the Court ("September 7 Letter," Dkt. No. 36). In its September 7 Letter, Bancorp purports "to very briefly provide the legal context for the claims and counterclaims that will be the subject of The Bancorp's motion." (September 7 Letter at 1.) Bancorp argues that Cestari's first three causes of action turn on whether an enforceable oral contract exists -- a point on which Bancorp argues there is no genuine issue of material fact because "all four factors [of New York law] are not satisfied in the record." (Id. at 2.) Next, Bancorp argues that Cestari's fourth cause of action similarly does not involve any genuine issue of material fact because the allegedly false statement was true, and the alleged statement falls within a qualified privilege. Regarding Cestari's fifth cause of action, Bancorp argues that there is no genuine issue of material fact regarding, at minimum, two of the four prongs necessary for such a claim. Bancorp separately requests summary judgment on each of the Counterclaims, arguing that "there is no dispute of fact that Plaintiff misused his corporate credit card by charging personal expenses to it." (Id. at 3-4.)
Defendant's Rule 56.1 Statement sets forth the above-listed arguments in greater detail, including references to the record. It purports to establish the material facts as to which Bancorp contends there are no genuine issues to be tried. (See Defendant's Rule 56.1 Statement at 2.) In support of its Rule 56.1 Statement, Bancorp filed the declaration of Michael C. Schmidt. ("Schmidt Declaration," Dkt. No. 40.)[4]
After receiving a one-week extension, Cestari filed his Rule 56.1 submissions on September 28, 2018. Like Bancorp, Cestari submitted a letter to the Court, arguing that Bancorp's September 7 Letter "is an inappropriate attempt to present its summary judgment argument in circumvention of this Court's directions." ("September 28 Letter," Dkt. No. 41.) Cestari filed both a counterstatement responsive to Defendant's Rule 56.1 Statement and his own Rule 56.1 Statement. Plaintiff's Counterstatement disputes nearly all of the relevant facts contained in Defendant's Rule 56.1 Statement. In Plaintiff's Rule 56.1 Statement, Cestari lays out what he purports to be the genuine issues of material fact in this action. In support of his Rule 56.1 Statement, Cestari filed the declaration of Amory McAndrew. ("McAndrew Declaration," Dkt. No. 44.)[5]
*334 On October 1, 2018, Bancorp responded to the September 28 Letter, requesting permission to file a reply to Plaintiff's Rule 56.1 Statement or, alternatively, permission to file its full summary judgment motion. ("October 1 Letter," Dkt. No. 45.)
II. LEGAL STANDARD
Under Rule 56 of the Federal Rules of Civil Procedure (" Rule 56"), a party is entitled to summary judgment if the evidence shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) ; see also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To survive summary judgment, the disputed factual issues must also be "genuine" -- that is, "sufficient evidence [must] favor[ ] the nonmoving party for a jury to return a verdict for that party." Id. at 249, 106 S.Ct. 2505.
The moving party bears the initial burden of showing that there are no genuine issues of material fact. See Celotex, 477 U.S. at 323, 106 S.Ct. 2548. If the moving party satisfies its burden, then the nonmoving party must offer evidence of open questions of material fact. In doing so, "the nonmoving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998).
When deciding whether the moving party is entitled to summary judgment, "the court must resolve all ambiguities and draw all justifiable factual inferences in favor of the party against whom summary judgment is sought." Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 309 (2d Cir. 2008). Thus, if there is "any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party" that supports a finding that a material factual dispute exists, summary judgment is improper. Gummo v. Village of Depew, N.Y., 75 F.3d 98, 107 (2d Cir. 1996).
III. DISCUSSION
A. PLAINTIFF'S CLAIMS
1. Counts I, II, and III: Failure to Pay Wages - Commissions; Breach of Contract; and Failure to Pay Wages - Vested Bonus Amounts
Resolution of Counts I, II, and III of the Amended Complaint depends on whether Cestari and Cohen entered into valid oral contracts for the payment to Cestari of a bonus and two transaction-specific commissions. While Bancorp argues that there is no genuine issue of material fact that no such contracts exist (see September 7 Letter at 2), Cestari *335 argues that the existence of such contracts remains an open question (see Plaintiff's Rule 56.1 Statement ¶¶ 4-5).
As Bancorp notes in its September 7 Letter, the Court of Appeals for the Second Circuit has set forth four factors for determining whether an oral agreement has binding effect. Those factors are "(1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether there was literally nothing left to negotiate or settle, so that all that remained to be done was to sign what had already been fully agreed to; and (4) whether the agreement at issue is the type of contract that is usually committed to writing." (September 7 Letter at 2 (citing Braun v. CMGI, Inc., 64 Fed. App'x 301 (2d Cir. 2003).) Bancorp argues that, at minimum, there is no genuine issue of material fact "to dispute that the alleged amount of compensation and the date of payment had never been fully determined, even if an oral agreement was otherwise entered into" and "to dispute that the alleged agreement was the sort of complex business matter that is normally subject to a written contract." (See id. )
Bancorp argues that the third prong -- "whether there was literally nothing left to negotiate or settle, so that all that remained to be done was to sign what had already been fully agreed to," R.G. Grp., Inc. v. Horn & Hardart Co., 751 F.2d 69, 76 (2d Cir. 1984) -- weighs in its favor because Cestari and Cohen never fully determined the alleged amount of compensation nor the date of payment for the alleged bonus or commissions. But, regarding the additional $ 400,000 bonus, Cestari testified that he was "promised an additional $ 400,000 ... when [he] met with Daniel [Cohen] in December of 2016." (Cestari Dep. Tr. at 234.) Neither party points to any deposition testimony by Cohen on this subject. The truthfulness of Cestari's assertion is therefore a factual issue that should be determined by the jury.
Regarding the alleged commission for the Wells Fargo Securitization, Cestari testified that he expected his commission to be "[forty] percent of the profit." (Cestari Dep. Tr. at 181.) He further explained how he believed this commission would be calculated:
My intent in making that deal was at some point we'd come up to bonus time and I'd be able to show them exactly how much more we made vis-à-vis the exit that the rest of the collateral could get. And let's say it was [$] 200,000 more because I got us into the Wells Fargo deal, [then] I expected the ... bonus for the extra $ 200,000 [to] be 40 percent of it or [$] 80,000 ... that should come to my [sic] because they wouldn't have not [sic] realized it if I didn't get them into the deal.
(Id. ) Furthermore, while Cohen testified that he did not recall a specific agreement between him and Cestari, Cohen "remember[ed] [Cestari] making a proposal that he should be rewarded for bringing about that sale." (Cohen Dep. Tr. at 121.) And Cohen responded, " 'Great, you should be rewarded,' in a variety of different ways of saying it." (Id. ) Thus, there exists a discrepancy between Cestari's and Cohen's testimony regarding their conversation about the alleged commission for the Wells Fargo Securitization.[6]
*336 Regarding the alleged commission for the Fixed Rate Portfolio Sale,[7] Cestari testified that he and Cohen "agreed that [Cestari] would get paid a commission like [Bancorp] paid HFF," which Cestari explained was "a half a point on the loans they sold for [the company]." (Cestari Dep. Tr. at 219.) According to Cestari, Cohen said "okay" in response to this proposal. (Id. ) Cestari further testified that he believed he earned his commission "[a]s soon as Silver Peak ... verbally told [him] what the bid was and essentially [they] put together the framework of the deal," which occurred in early March of 2017. (Id. at 225-26.) As with the Wells Fargo Securitization, Cohen disputes Cestari's recounting of their conversation. Specifically, Cohen does not recall entering into an arrangement with Cestari for a specific rate of compensation for the Fixed Rate Portfolio Sale, although he admits that they discussed Cestari working on the deal. (See Cohen Dep. Tr. at 129.) As with the alleged commission for the Wells Fargo Securitization, the Court finds that a discrepancy exists between Cestari and Cohen's testimony regarding their conversation about the alleged commission for the Fixed Rate Portfolio Sale.
Based on the material differences in testimony described above, the Court finds that "whether there was literally nothing left to negotiate or settle" depends, in part, on an assessment of the credibility of Cestari's and Cohen's competing testimony. R.G. Grp., 751 F.2d at 76. Resolution of this issue is therefore one that should be left to the jury.
Bancorp also argues that the fourth prong -- "whether the agreement concerns those complex and substantial business matters where requirements that contracts be in writing are the norm rather than the exception," id.-- weighs in its favor. Bancorp notes that Cestari had a written employment contract and the company generally requires compensation to be approved by the compensation committee, as laid out in the employee handbook. (See Defendant's Rule 56.1 Statement ¶¶ 17-24.) However, this argument ignores Cestari's theory of the case, which is that Cestari and Cohen had "a course of dealing over the years of entering into verbal agreements whereby Cohen promised, and paid, Cestari additional compensation for performing work above and beyond his assigned duties." (Plaintiff's Rule 56.1 Statement ¶ 3.) In support of this theory, Cestari points to his own deposition testimony, in which he explained that he entered into verbal agreements with Cohen multiple times both while he worked as a consultant and as a full-time employee of Bancorp. (See Cestari Dep. Tr. at 23-24.) Furthermore, when asked during his deposition whether he believed he would be entitled to compensation for anything beyond what was stated in the offer letter, Cestari said that "[a]t the time [he] signed it, [he] believe[d] [that on] an ongoing basis if Daniel [Cohen] had side projects he wanted [Cestari] to do that that would be looked at outside of th[e] offer letter." (Id. at 43.) Cestari thus argues that the offer letter "does not in any way preclude [him] from entering into additional agreements with the Chairman of the Board for additional compensation." (Plaintiff's Counterstatement at 5-6.) Whether the alleged oral agreements regarding the payment of a bonus and commissions were the type of *337 agreements "where requirements that contracts be in writing are the norm rather than the exception" therefore depends, in part, on a determination of Cestari's and Cohen's historical practices, as well as on their credibility. R.G. Grp., 751 F.2d at 76. As with the third prong, resolution of this issue is therefore one that should be left to the jury.
In support of its argument for summary judgment on Counts I through III of the Amended Complaint, Bancorp relies primarily on Braun v. CMGI, Inc., 64 Fed. App'x 301 (2d Cir. 2003)[8] , a summary order in which the Second Circuit upheld the district court's grant of summary judgment in favor of a defendant-employer. In Braun, the plaintiff-employee argued that there existed a genuine issue of material fact as to whether the parties intended their oral agreement to be binding in the absence of a writing. The Second Circuit upheld the district court because deposition testimony established that the defendant-employer told the plaintiff-employee that a written offer letter was required. See id. at *2. The Second Circuit further opined that the fourth factor (whether the agreement was the type typically committed to writing) favored the defendant-employer because "a sophisticated party such as [plaintiff-employee] could not reasonably have believed that an options package, which both parties hoped would become very valuable, would be fixed and made enforceable in a conversation." Id. at *3.
The facts make Braun distinguishable from the present action. Here, unlike the circumstances presented in Braun, neither party cites to deposition testimony indicating Cohen told Cestari that a written offer or agreement was required. Instead, Bancorp cites to Cohen's testimony regarding the company's compensation committee, as well as Cestari's written offer of employment -- neither of which explicitly preclude or forbid the alleged oral agreements. As for the second determination from Braun, Bancorp has a colorable argument that "a sophisticated party such as [Plaintiff] could not reasonably have believed that" the bonus and commissions, which were of substantial value to Cestari, "would be fixed and made enforceable in a conversation." Id. at *3. But Cestari responds that on several occasions he previously entered into verbal agreements with Bancorp for compensation beyond his regular salary. Based on this history and past practice, if Cestari's testimony is credited, a reasonable jury could find that the alleged oral agreements between Cestari and Cohen at issue in this action were, in fact, not the type of contract that is usually committed to writing.
In deciding a motion for summary judgment, the Court must "resolve all ambiguities and draw all justifiable factual inferences in favor of" the plaintiff. Major League Baseball Props., 542 F.3d at 309. Even if it seems unlikely that a plaintiff will win at trial, if there exists "any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party" that supports a finding that a material factual dispute exists, summary judgment is improper. Gummo, 75 F.3d at 107. Here, the Court is inclined to conclude that there exists evidence from which a reasonable inference could be drawn in Cestari's favor, which *338 would make summary judgment on Counts I through III of the Amended Complaint inappropriate.
2. Count IV: Defamation Per Se
Count IV is Cestari's claim for defamation per se, which turns on a determination of what (if anything) Bancorp and/or its employees told third parties about Cestari's termination. New York law, as Bancorp notes in its September 7 Letter, requires the following elements for a defamation claim: "a false statement, published without privilege or authorization to a third party, constituting fault[,] ... [which] must either cause special harm or constitute defamation per se." Peters v. Baldwin Union Free Sch. Dist., 320 F.3d 164, 169 (2d Cir. 2003). Bancorp argues that summary judgment in its favor is warranted on Count IV because the allegedly false statement is true, and the alleged statement falls within the qualified privilege accorded to statements made in the employment context. (See September 7 Letter at 2-3.) Cestari, on the other hand, argues that there is a genuine issue of material fact as to whether Wechsler and other Bancorp employees purposefully and with malicious intent maligned Cestari to third parties. (See Plaintiff's Rule 56.1 Statement ¶ 1.)
Ultimately, resolution of Count IV depends on the "real" reason for Cestari's termination. If, as Bancorp contends, the company terminated Cestari's employment for cause, then the allegedly false statement is, in fact, true. In that case, summary judgment in Bancorp's favor would be warranted. But if, as Cestari contends, his termination was not for cause, then the allegedly false statement is, in fact, false -- and potentially actionable. In that case, summary judgment in Bancorp's favor would not be warranted.
The Court is inclined to conclude that it would be premature to resolve Count IV on a motion for summary judgment because the record on the "real" reason for Cestari's termination is inconclusive, that is, on the record before the Court, disputes of material facts exist as to the grounds for Cestari's termination. For example, Cestari seems to have testified both that he was informed that he was terminated for cause and that he was informed that he was not terminated for cause. At one point in his deposition, Cestari stated the following: "[M]y [termination] letter doesn't specifically say for cause, those terms. I asked Bernie if I was being fired for cause, and he said yes." (Cestari Dep. Tr. at 111.) But at another point in his deposition, Cestari admitted that his termination letter said that he was being terminated for violating the company's policy regarding expense reports. (See id. ) And earlier in the deposition, Cestari answered "yes" to the question "[w]ere you told by Bancorp that you were being fired for cause?" (Id. at 107.) Thus, Cestari both admitted that he was informed that he was terminated for cause, but also denied that reality.
Meanwhile, the deposition testimony to which Bancorp cites in support of summary judgment on Count IV is similarly conflicted and thus unpersuasive. That testimony indicates that Cohen saw e-mails regarding Cestari's use of his corporate credit card. Those e-mails state that the company might cancel Cestari's corporate card, but they were "silent as to any allegation of misconduct or the need to discharge him." (Cohen Dep. Tr. at 173.) Furthermore, Damian Kozlowski, the CEO and President of Bancorp, testified that it was "[his] decision" to terminate Cestari's employment. (Kozlowski Dep. Tr. at 70.) Kozlowski testified that his decision was based on "[a] recommendation from John Leto," another Bancorp employee who performed an investigation regarding Cestari's *339 use of his corporate credit card. (Id. ) If Kozlowski's testimony is believed, then Cestari was, in fact, terminated for cause. However, the truthfulness of Kozlowski's testimony is not a matter that the Court should accept at face value. Rather, in view of arguably conflicting testimony from Cestari and possibly Cohen, it raises an issue that should be determined by the jury. Accordingly, the Court is not persuaded -- as Bancorp would like it to conclude -- that the allegedly false statement made by Bancorp employees to third parties was a true statement.
This determination notwithstanding, there exists another barrier to the Court granting summary judgment in Bancorp's favor. Cestari argues that there is an open question about whether Wechsler "purposefully and with malicious intent maligned Cestari in the marketplace." (Plaintiff's Rule 56.1 Statement ¶ 1.) In his deposition, Wechsler admitted that he "volunteered" the information that "[Cestari] was terminated for cause" to people both internal and external to Bancorp. (Wechsler Dep. Tr. at 148.) According to Wechsler, he made those statements because "[he] did not want people to think that there was ... anything negative going on with The Bancorp or with [the company's] business ... [and] [he] didn't want people tying getting out of the fixed rate business and Cestari leaving together." (Id. at 155-56.)
Cestari, however, challenges the truth of Wechsler's testimony regarding his motive. He points out that -- at around the same time that Wechsler made the statements to the third parties -- Wechsler read Cestari's e-mails, which indicated that Cestari was in discussions with the company about assuming leadership of the CMBS group. (See id. at 132 ("Cestari's e-mails came to me after he was terminated, and I saw it in an e-mail.").) Cestari's theory appears to be that Wechsler made the statements about Cestari to third parties out of ill-will and improper motives in response to Cestari attempting to assume leadership of the CMBS group. (See, e.g., id. at 135 ("I thought [Cestari's actions] [were] inappropriate, awfully nervy.").) Whether Wechsler "purposefully and with malicious intent maligned Cestari in the marketplace" is therefore an open question of material fact. (Plaintiff's Rule 56.1 Statement ¶ 1.) Because the Court is inclined to conclude that there exists evidence from which a reasonable inference could be drawn in Cestari's favor, summary judgment on Count IV of the Amended Complaint appears to be unwarranted.
3. Count V: Tortious Interference with Business Relations
Count V is Cestari's claim for tortious interference with business relations, the resolution of which turns on whether employees of Bancorp interfered with Cestari's business relations with third parties. Specifically, Cestari claims that Bancorp employees interfered with his business relations by attempting to prevent him from securing a position with Oaktree. New York law, as Bancorp notes in its September 7 Letter, requires four elements to establish a claim of tortious interference with business relations: "(1) business relations with a third party; (2) the defendant's interference with those business relations; (3) the defendant acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means; and (4) injury to the business relationship." Nadel v. Play-By-Play Toys & Novelties, Inc., 208 F.3d 368, 382 (2d Cir. 2000).
Bancorp argues that summary judgment in its favor is warranted on Count V because, at the very least, Cestari cannot adduce evidence to satisfy the third and *340 fourth prongs of New York law. (See September 7 Letter at 3.) Regarding the third prong, Bancorp contends that Count V fails because the Bancorp employees' actions were based on truthful information. However, as discussed supra Part III.A.2, it remains an open question whether the information that Bancorp employees shared with third parties (i.e., Cestari was terminated for cause) was truthful. The Court therefore finds that there is, in fact, a genuine issue of material fact as to whether Bancorp employees "used dishonest, unfair, or improper means." Nadel, 208 F.3d at 382.
Alternatively, Bancorp argues that Count V fails on the third prong because "defendant did not act with the sole purpose of harming the plaintiff." (September 7 Letter at 3.) In support of this argument, Bancorp points to deposition testimony from Wechsler, who said that he shared information with Oaktree in order to protect his friend at Oaktree, Keith Gollenberg, who was considering hiring Cestari, from embarrassment. Specifically, Wechsler testified to the following:
I called Keith up and I said, Keith, I know you're talking to Cestari.... And we're friends in the industry.... I want you to know now, because I don't want you to get embarrassed later, that Cestari was terminated for cause. And I don't want you finding out after you hire him and be embarrassed.
(Wechsler Dep. Tr. at 152.) Wechsler further testified that he shared information about Cestari at an industry dinner because he did not want people mistakenly to think that Cestari's termination was related to Bancorp's exit from the fixed-rate business. (See id. at 155-56.)
Cestari contests the truthfulness of Wechsler's testimony. He argues that "[a]ssuming that Wechsler's sole motive in broadcasting Cestari's termination was to protect Gollenberg and The Bancorp goes too far and ignores additional circumstances that influenced Wechsler's behavior." (Plaintiff's Counterstatement at 38.) Specifically, Cestari cites to Wechsler's deposition testimony indicating that Wechsler received access to Cestari's e-mails, which demonstrated that Cestari had been negotiating to assume leadership of the CMBS group. (See Wechsler Dep. Tr. at 132-135; see also supra Part III.A.2.) Cestari also cites to Wechsler's testimony that there was "a lot of hostility [and] a lot of aggression" between Wechsler and Cestari at that point in time. (Id. at 143-44.) The Court is therefore inclined to find that an open question of material fact exists as to whether Wechsler acted with "the sole purpose of harming" Cestari when he made statements about Cestari's termination to third parties. Nadel, 208 F.3d at 382.
Separately, Bancorp argues that Cestari cannot adduce evidence to satisfy the fourth prong of New York law, i.e., whether there was an injury to the business relationship. Bancorp argues that "there can be no dispute that The Bancorp's actions did not injure Plaintiff's 'business relationship,' as Plaintiff himself claims that Oaktree would have still considered employing Plaintiff had he settled with or entered into a non-disparagement agreement with The Bancorp." (September 7 Letter at 3.) Bancorp correctly notes that Cestari does not dispute that the Oaktree employee, Gollenberg, told Cestari that if he settled with and entered into a non-disparagement agreement with Bancorp, Oaktree would still consider employing Cestari, but that Cestari never asked anyone at Bancorp whether they would agree to enter into such an agreement with him. (See Plaintiff's Counterstatement at 39.) Nonetheless, Cestari disputes Bancorp's *341 conclusion that his business relations were not injured by Bancorp's actions. Specifically, Cestari notes that Gollenberg told him that Oaktree "could not offer [him] employment" because "[someone from Bancorp] said not nice things about [him]." (Cestari Dep. Tr. at 103-04.) The Court is therefore inclined to find that an open question of material fact also exists as to whether there was an "injury to the business relationship." Nadel, 208 F.3d at 382.
* * * *
Based on its review of the parties' correspondence, the parties' Rule 56.1 Statements and the declarations and exhibits attached to them, the Amended Complaint, and the other materials in the record, the Court is persuaded that several genuine issues of disputed material fact would make summary judgment on Counts I through V of the Amended Complaint inappropriate and, furthermore, likely result in a denial of such a motion if one were formally filed. Under similar circumstances, courts in this Circuit have denied requests for pre-motion conferences regarding contemplated motions for summary judgment. See Strougo v. Barclays PLC, 317 F.Supp.3d 815, 819 (S.D.N.Y. 2018) (Marrero, J.); Martin v. City of New York, No. 11 Civ. 4507, 2013 WL 4899290, at *1 (E.D.N.Y. Sept. 11, 2013) ; see also C.D.S., Inc. v. Zetler, 198 F.Supp.3d 323, 339-40 (S.D.N.Y. 2016) (Marrero, J.) (deeming a pre-motion letter to be a motion for summary judgment and denying that motion); Rivera v. Meyers, No. 11 Civ. 2064, 2012 WL 1078187, at *3 (E.D.N.Y. Mar. 30, 2012) (deeming a pre-motion letter to be a motion for summary judgment and granting that motion).
Accordingly, the Court finds that summary judgment motion practice under the circumstances in this action would be needlessly wasteful of the parties' time and resources, likely futile, and thus inconsistent with judicial economy. The Court therefore denies the request of Bancorp for a pre-motion conference regarding its contemplated motion for summary judgment resolving all counts of the Amended Complaint.
B. BANCORP'S COUNTERCLAIMS
Bancorp asserts five counterclaims: (1) fraud; (2) equitable forfeiture and the faithless servant doctrine; (3) conversion; (4) unjust enrichment; and (5) breach of fiduciary duty. Since all the Counterclaims hinge on the same conduct -- namely, Cestari's use of a corporate credit card for personal expenses -- the Court addresses the Counterclaims collectively.[9]
Bancorp argues that summary judgment in its favor is warranted on the five Counterclaims because there is no dispute in the record that Cestari "misused his corporate credit card by charging personal expenses to it." (September 7 Letter at 3.) In support of this argument, Bancorp primarily contends that the company's employee handbook and expense reimbursement policy prohibited the use of a corporate credit card for personal expenses. Bancorp also notes that it sent Cestari a spreadsheet detailing his expenses and asked him to identify which were personal charges. (See Defendant's Exhibit M.) Cestari does not dispute this fact. (See Plaintiff's Counterstatement at 10.) Lastly, Bancorp notes that Cestari's "various justifications" for using his corporate card *342 for personal expenses are "inconsistent." (Defendant's Rule 56.1 Statement ¶ 31.) Specifically, Cestari claimed during his deposition that, at some points, he "inadvertently put [the personal expenses] on the corporate card" (Cestari Dep. Tr. at 161, 174) and, at other times, Cestari said that "it was [his] understanding there was nothing wrong" with charging personal expenses to the corporate card (id. at 62).
Cestari argues that summary judgment on the Counterclaims in favor of Bancorp is unwarranted because there remains a genuine issue of material fact regarding whether "Cestari had a course of dealing with Matt Sowa whereby Sowa would notify Cestari when he had personal charges that needed to be addressed" and whether "there was room for modification to [Bancorp's] policies." (Plaintiff's Rule 56.1 Statement ¶¶ 7-8.) In support of this argument, Cestari points to his own deposition testimony, in which he explained that "it was [his] understanding there was nothing wrong with [charging personal expenses to his corporate credit card]." (Cestari Dep. Tr. at 62.) Cestari's understanding allegedly was based on his discussions with Matt Sowa ("Sowa"), a Bancorp employee who worked in the accounting department. (See id. ) According to Cestari, he had a conversation with Sowa in May 2016 during which they devised a system whereby Sowa would notify Cestari of personal charges, at which time Cestari would need to reimburse the company for those expenses:
My understanding of the system that Mat [sic] and I set up specifically for me was that monthly he would call. We'd go over all of my expenses. If there was a personal charge, I would tell Mat [sic] or he would flag it, bring it up. I would say yes, that's personal; and I would send him a check.
(Id. at 65.) Furthermore, Cestari argues that the employee handbook -- to which Bancorp points in support of its assertion that the company had a policy prohibiting employees from using their corporate cards for personal expenses -- left room for adjustment. Specifically, Cestari notes that the handbook states:
[F]rom time to time, situations or problems may arise which the Company believes require or deserve special handling, even though a policy stated in this Handbook may indicate a different general rule. Accordingly, just because a particular policy or procedure is generally followed in certain circumstances does not mean that the Company must apply that policy or procedure in every instance.
(Defendant's Exhibit L at 3.) Additionally, Cestari asserts that it was his understanding that "there was nothing [in the employee handbook] that said you were prohibited from [charging personal expenses to a corporate card]." (Cestari Dep. Tr. at 135.)
Based on the preceding record of admissible evidence, the Court is inclined to conclude that there exists a genuine issue of material fact as to whether Cestari violated Bancorp policy. Given these circumstances, and as discussed supra Part II.A, the Court finds that summary judgment motion practice on the Counterclaims would be needlessly wasteful of the parties' time and resources, likely futile, and thus inconsistent with judicial economy. The Court therefore denies the request of Bancorp for a pre-motion conference regarding its contemplated motion for summary judgment on the Counterclaims.
IV. ORDER
For the reasons discussed above, it is hereby
ORDERED that the request of defendant The Bancorp, Inc. for a pre-motion *343 conference regarding its anticipated motion for summary judgment (Dkt. No. 33) is DENIED; and it is further
ORDERED that the parties confer and, within ten days of the date of this Order, propose a date for the start and duration of trial of this action.
SO ORDERED.

Except as otherwise noted, the Court derives the factual background below from the Original Complaint, the Amended Complaint (Dkt. No. 5), Defendant's Answer (Dkt. No. 14), and Plaintiff's Answer to the Counterclaims (Dkt. No. 15). Except where specifically quoted, no further citation will be made to these sources.

Specifically, Bancorp asserts the following affirmative defenses: (1) the Amended Complaint fails to state a claim upon which relief can be granted; (2) Plaintiff's damages claims are barred, either in whole or in part, by his failure to mitigate damages; (3) Plaintiff's claims are barred, either in whole or in part, because Bancorp has paid Plaintiff all monies due to him; (4) Plaintiff's claims are barred, either in whole or in part, by the doctrines of laches, waiver, estoppel, and/or avoidable consequences; (5) Plaintiff's claims are barred, either in whole or in part, by the statute of frauds; (6) Plaintiff's claims are barred, either in whole or in part, by the doctrine of offset or set off; (7) Plaintiff's claims are barred by the faithless servant doctrine; (8) Plaintiff's claims are barred, either in whole or in part, by the doctrine of unclean hands; (9) Plaintiff's defamation claim is barred because any statements made by Bancorp employees to third parties were true; (10) Plaintiff's defamation claim is barred by the qualified privilege doctrine; (11) Plaintiff's defamation claim is barred because any Bancorp employees who allegedly provided statements about Plaintiff to third parties were not acting as agents of Bancorp and/or were acting outside the scope of their employment at the time the statements were made; and (12) Plaintiff's claims are barred, either in whole or in part, by failure of consideration.

Specifically, Cestari asserts the following affirmative defenses: (1) the Counterclaims fail to state a claim upon which relief may be granted; (2) the Counterclaims are barred, either in whole or in part, by the doctrines of laches, waiver, estoppel, and/or avoidable consequences; (3) at all relevant times, Cestari acted in accordance with Bancorp's policies and procedures; (4) the Counterclaims are barred, either in whole or in part, by the doctrines of res judicata and/or collateral estoppel; (5) the Counterclaims are barred, either in whole or in part, by the doctrine of unclean hands; (6) the Counterclaims are barred, either in whole or in part, by failure to plead fraud with specificity; (7) the Counterclaims are barred, either in whole or in part, by the statute of limitations; and (8) the Counterclaims are barred, either in whole or in part, by Bancorp's failure to mitigate damages.

The Schmidt Declaration attached as exhibits the following documents: Exhibit A - Plaintiff's Amended Complaint (Dkt. No. 40-1); Exhibit B - Defendant's Answer to the Amended Complaint with Counterclaims (Dkt. No. 40-2); Exhibit C - Excerpts from the Transcript of Plaintiff's Deposition (Dkt. Nos. 40-3, 40-4, 40-5); Exhibit D - Excerpts from the Transcript of Cohen Deposition (Dkt. No. 40-6); Exhibit E - Excerpts from the Transcript of Wechsler Deposition (Dkt. No. 40-7); Exhibit F - Excerpts from the Transcript of Kozlowski Deposition (Dkt. No. 40-8); Exhibit G - Excerpts from the Transcript of Kohan Deposition (Dkt. No. 40-9); Exhibit H - Plaintiff's Employment Agreement with Bancorp (Dkt. No. 40-10); Exhibit I - Plaintiff's Answer to Defendant's Counterclaims (Dkt. No. 40-11); Exhibit J - Retention Bonus Letter (Dkt. No. 40-12); Exhibit K - Kozlowski Letter dated 1/23/2017 (Dkt. No. 40-13); Exhibit L - Excerpts from Bancorp Employee Handbook (Dkt. No. 40-14); Exhibit M - Spreadsheet of Plaintiff's Charges to Corporate Credit Card (Dkt. No. 40-15); and Exhibit N - Plaintiff's E-mail dated 4/14/2017 re: Personal Charges to Corporate Credit Card (Dkt. No. 40-16).

The McAndrew Declaration attached as exhibits the following documents: Exhibit 1 - Transcript of the Deposition of Damian Kozlowski (Dkt. No. 44-1); Exhibit 2 - Transcript of the Deposition of Daniel Cohen (Dkt. No. 44-2); Exhibit 3 - Transcript of the Deposition of Ron Wechsler (Dkt. No. 44-3); Exhibit 4 - Transcript of the Deposition of Robert M. Cestari (Dkt. Nos. 44-4, 44-5, 44-6, 44-7, 44-8, 44-9); Exhibit 5 - Exhibit 2 to the Deposition of Daniel Cohen (Dkt. Nos. 44-10, 44-11, 44-12); Exhibit 6 - Exhibit 10 to the Deposition of Daniel Cohen (Dkt. No. 44-13); and Exhibit 7 - Exhibit 11 to the Deposition of Daniel Cohen (Dkt. No. 44-14).
Upon receipt of Plaintiff's courtesy copies, the Court informed Plaintiff that some of the exhibits were submitted in violation of the Court's individual practices, which require parties to submit only the relevant excerpts of deposition transcripts. In light of the Court's directive, Plaintiff subsequently re-filed the McAndrew Declaration and the transcript-related exhibits. (See"Revised McAndrew Declaration," Dkt. No. 46.)

Furthermore, and as Cestari notes in his opposition to Bancorp's original letter seeking permission to file a motion for summary judgment, resolution of this issue is a classic "he said; she said" situation -- and therefore not one that is ripe for adjudication by summary judgment. (See July 17 Letter at 1.)

The parties alternatively refer to the Fixed Rate Portfolio Sale as the "Silver Peak deal." The Court will refer to this transaction as the Fixed Rate Portfolio Sale except when quoting deposition testimony.

The Second Circuit has instructed that summary orders do not have precedential effect and pre-2007 summary orders should not be cited by parties (except in limited circumstances not applicable to this action). See Second Circuit Local Rule 32.1.1. Nonetheless, because Bancorp relied upon the case and the Court finds it distinguishable, the Court will address Bancorp's argument.

The Court notes that the parties do not dispute that Cestari did, in fact, charge personal expenses to his corporate credit card. The potential dispute revolves around whether those charges violated Bancorp's policies and, if so, whether that violation was the "real" reason for Cestari's termination.